UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EVAN FLANAGAN,

     Plaintiff,

v.

MEDMETRY, INC.,
a Florida Profit Corporation,
RICHARD ALVAREZ, Individually, and
AMlN KOLBEHDARI, Individually,

     Defendants.
_____/

CIVIL ACTION NO.

JURY TRIAL DEMANDED

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

1.     This case concerns a healthcare staffing company, Medmetry, Inc. ("Medmetry"), its Chief Executive Officer, Richard Alvarez ("Alvarez"), its Chief Operating Officer, Amin Kolbehdari ("Kolbehdari"), and its former healthcare staffing sales employee, Plaintiff Evan Flanagan ("Flanagan"), who regularly worked over 40 hours a week in a non-exempt position but was not properly compensated for all of the overtime hours he worked, and who is contractually owed a substantial amount of unpaid commissions.

2.     Flanagan brings this three-count action for unpaid overtime under the FLSA (Count I), Breach of Contract (Count II), and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III).

## SUBJECT MATTER JURISDICTION

3.      This Court has jurisdiction over Flanagan's FLSA claim under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

4.      The Court has supplemental jurisdiction over Flanagan's Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing claims pursuant to 28 U.S.C. § 1367 as these claims are so related to Plaintiff's FLSA claim that they form part of the same case or controversy.

5.      This Court has the authority to grant declaratory relief pursuant to the FLSA and the Federal Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201-02.

## VENUE

6.      Venue is proper in this Court under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within the Middle District of Florida.

7.      Defendants conduct substantial and not isolated business in the Middle District of Florida.

8.      Defendants have agents and employees in the Middle District of Florida.

9.      Defendants' Registered Agent is located in the Middle District of Florida.

## PARTIES AND PERSONAL JURISDICTION

9.     At all times relevant hereto, Plaintiff Evan Flanagan was an individual residing in Hillsborough County, Florida.

10.     Defendant Medmetry is a Florida Profit Corporation with a primary place of business located in Miami-Dade County, Florida.

11.     Defendant Richard Alvarez is Medmetry's Chief Executive Officer and, upon information and belief, resides in Miami-Dade County, Florida.

12.     Defendant Amin Kolbehdari is Medmetry's Chief Operating Officer and, upon information and belief, resides in Miami-Dade County, Florida.

## FLSA COVERAGE

13.     During the relevant time period, which is October 29, 2019, until March 17, 2020, and April 1, 2020, until July 15, 2022, Medmetry was Flanagan's "employer" within the meaning of 3(d) of the FLSA.  29 U.S.C. § 203(d).

14.     During the relevant time period, Flanagan was an "employee" of Medmetry within the meaning of the FLSA.  29 U.S.C. § 203(e).29,

15.     During the relevant time period, Medmetry determined the rate and the method of payment for Plaintiff.

16.     During the relevant time period, Medmetry maintained some records regarding the time Plaintiff worked but failed to maintain complete and accurate time records in contravention of the FLSA's recordkeeping requirement.

3

17.    The FLSA defines the term "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to any employee." 29 U.S.C. § 203(d).

18.    The statutory definition of "employer" includes corporate officers, participating shareholders, supervisors, managers, or other employees where those individuals exercise some supervisory authority over employees and are responsible in whole or in part for the alleged violation. *See Id*.

19.    During the relevant time period, Defendant Alvarez was Medmetry's Chief Executive Officer.

20.    During the relevant time period, Defendant Alvarez was involved in the day-to-day business operation of Medmetry.

21.    During the relevant time period, Defendant Alvarez was responsible for supervising the employees at Medmetry.

22.    During the relevant time period, Defendant Alvarez was responsible for the compensation or lack thereof paid to employees at Medmetry.

23.    During the relevant time period, Defendant Alvarez had the authority to hire and fire employees at Medmetry.

24.    During the relevant time period, Defendant Alvarez had the authority to direct and supervise the work of employees at Medmetry.

25.     During the relevant time period, Defendant Alvarez had the authority to sign on the business's checking accounts, including payroll accounts, at Medmetry.

26.     During the relevant time period, Defendant Alvarez had the authority to make decisions regarding employee compensation and capital expenditures at Medmetry.

27.     During the relevant time period, Defendant Alvarez was responsible for the day-to-day affairs of Medmetry.

28.     During the relevant time period, Defendant Alvarez was responsible for determining whether Medmetry complied with the Fair Labor Standards Act.

29.     Defendant Alvarez controlled Flanagan's pay structure and the employment relationship during the relevant time period.

30.     As such, during the relevant time period, Defendant Alvarez was the employer of Flanagan within the meaning of 3(d) of the FLSA and is jointly, severally, and liable for all damages.

31.     During the relevant time period, Defendant Kolbehdari was Medmetry's Chief Operating Officer.

32.     During the relevant time period, Defendant Kolbehdari was involved in the day-to-day business operation of Medmetry.

33.    During the relevant time period, Defendant Kolbehdari was responsible for supervising the employees at Medmetry.

34.    During the relevant time period, Defendant Kolbehdari was responsible for the compensation or lack thereof paid to employees at Medmetry.

35.    During the relevant time period, Defendant Kolbehdari had the authority to hire and fire employees at Medmetry.

36.    During the relevant time period, Defendant Kolbehdari had the authority to direct and supervise the work of employees at Medmetry.

37.    During the relevant time period, Defendant Kolbehdari had the authority to sign on the business's checking accounts, including payroll accounts, at Medmetry.

38.    During the relevant time period, Defendant Kolbehdari had the authority to make decisions regarding employee compensation and capital expenditures at Medmetry.

39.    During the relevant time period, Defendant Kolbehdari was responsible for the day-to-day affairs of Medmetry.

40.    During the relevant time period, Defendant Kolbehdari was responsible for determining whether Medmetry complied with the Fair Labor Standards Act.

41.     During the relevant time period, Defendant Kolbehdari controlled Flanagan's pay structure and the employment relationship.

42.     As such, during the relevant time period, Defendant Kolbehdari was the employer of Flanagan within the meaning of 3(d) of the FLSA and is jointly, severally, and liable for all damages.

## ENTERPRISE AND INDIVIDUAL COVERAGE

43.     During the relevant time period, Defendants were an "enterprise" within the meaning of 3(r) of the FLSA. 29 U.S.C. § 203(r).

44.     During the relevant time period, Defendants were an enterprise in commerce or in the production of goods for commerce within the meaning of 3(s)(1) of the FLSA because they have had employees engaged in commerce.  29 U.S.C. § 203(s)(1).

45.     Defendants had at least two employees during the relevant time period.

46.     During the relevant time period, Defendants had an annual gross business volume in excess of $500,000.00 per annum.

47.     During the relevant time period, Flanagan was an individual employee who engaged in commerce or in the production of goods for commerce as defined by 29 USC § 206-207.

48.     Specifically, Flanagan regularly made telephone calls to persons located in other States.

49.     Flanagan also regularly handled records of interstate transactions.

## WAGE VIOLATIONS

50.     During the relevant time period, Defendants misclassified Flanagan as an exempt employee.

51.     Defendants always paid Plaintiff a salary instead of paying him hourly during the relevant time period.

52.     During the relevant time period, Flanagan was not eligible to be classified as exempt from the overtime rules under the Fair Labor Standards Act (FLSA).

53.     Based on the information presently available to Plaintiff, from October 29, 2019, through December 31, 2020, Flanagan worked an average of 40-45 hours per week.

54.     Based on the information presently available to Plaintiff, from January 1, 2020, through March 17, 2020, Flanagan worked at least 45 hours per week.

55.     Based on the information presently available to Plaintiff, from April 1, 2020, through November 2020, Flanagan worked an average of at least 65 hours per week.

56.     Based on the information presently available to Plaintiff, during

December 2020, Flanagan worked an average of at least 55 hours per week.

57.     Based on the information presently available to Plaintiff, from January through November 2021, Flanagan worked an average of at least 60 hours per week.

58.     From December 2021 through July 15, 2022, Flanagan worked an average of at least 50 hours per week.

59.     Defendants did not compensate Plaintiff overtime for the hours he worked beyond 40 hours in a week at any time during his employment.

## **FACTS**

60.     On or about April 1, 2020, Flanagan began working for Medmetry in a different position as a healthcare staffing sales employee.

61.     While Flanagan chose to refer to himself as a "Senior Account Executive," this self-designation did not alter his role as a healthcare staffing sales employee.

62.     Flanagan's pay structure with Medmetry changed over time.

63.     Specifically, beginning on about April 1, 2020, through the end of July 2020, Flanagan was paid a salary of $72,000.

64.     On or about July 31, 2020, Flanagan's salary increased to $100,000.

65.     At that same time, Flanagan became eligible for commissions pursuant to a "Commission Bonus Agreement" (the "Agreement"). Attached as

**Exhibit A**).

66.     The Agreement was entered into on or about July 31, 2020.

67.     This salary and commission structure remained in place until his separation of employment in July 2022.

68.     Throughout the entirety of his employment, Flanagan was not paid any overtime pay.

69.     Throughout the entirety of his employment, Flanagan regularly worked more than 40 hours per week.

70.     Medmetry only paid Flanagan two commission payments during his employment.

71.     The first commission payment, for $10,000, occurred in June 2021.

72.     Medmetry called this payment an "advance against future commissions."

73.     The second commission payment, for $100,000, occurred in December 2021.

74.     Medmetry also called this payment an "advance against future commissions."

75.     However, Flanagan had already earned this commission pursuant to a separate agreement[1] between Medmetry, Defendant Alvarez, Defendant

---

[1] This agreement was reflected in email in Defendants' exclusive possession, custody, or control

Kolbehdari, and Flanagan that Flanagan would be paid a bonus of $2 per hospital bed of new business he closed by December 2021.

76.    This agreement capped the bonus at 50,000 beds or $100,000.

77.    Flanagan exceeded the 50,000-bed cap before the deadline in December 2021 and earned the full $100,000 bonus.

78.    Under the Agreement attached as Exhibit A, Flanagan was entitled to a Monthly Commission Bonus.

79.    Section 3 of the Agreement provides that the Monthly Commission Bonus "shall be equal to 15 percent of the Monthly Applicable Healthcare Staffing Net Profits."

80.    The "Monthly Applicable Healthcare Staffing Net Profits" is defined under Section 4 of the Agreement as:

> [G]ross revenues received by the Company during a calendar month on account of its healthcare staffing services, **reduced by** the salaries of you, Rick Alvarez (up to $5,000 per month), and Amin Kolbehdari (up to $5,000 per month) for the month; **further reduced by** compensation (including any employment taxes or other withholdings therefrom) of any kind paid during the month to other employees or independent contractors of the Company who provide services in furtherance or support of the Company's healthcare staffing services, **further reduced by** all other ordinary and necessary business expenses relating to the Company's healthcare staffing services deductible under Section 162 of the Internal Revenue Code of 1986, as amended (the "Code"), and paid by the Company during the month, including but not limited to attorneys' fees, accountants' fees, insurance, unreimbursed travel expenses, allocable state and local

---

and affirmed in verbal conversations between Flanagan and Medmetry.

taxes, and software subscriptions, and **further reduced by** any other expense relating to the Company's healthcare staffing services which may be deductible by the Company on lines 7 through 19 of IRS Firm 1120-S, or the equivalent sections of any future information return required to be filed by Subchapter S corporations under the Code, paid by the Company during the month." (Emphasis added).

81.     Moreover, Section 6 of the Agreement required Medmetry to calculate the Monthly Commission Bonus **monthly** and to provide Flanagan with numerous financial-related documents to enable him to independently verify the amount of the commissions due to him each month.

82.     Specifically, Section 6 provides:

**The Company shall calculate and pay the Monthly Commission Bonus, if any, as part of the next full pay period immediately following the end of the month. Upon request, the Company shall provide you with the components of, and the records underlying, its calculation of a particular month's Monthly Commission Bonus**, but the Company's determination of a month's Monthly Commission Bonus shall be made solely by the Company and is final and not subject to change, except in the event the Company, in its sole discretion, determines that an error was made in its initial calculation. The parties agree that no Monthly Commission Bonus is due for either April or May 2020. (Emphasis added).

83.     While Section 6 indicates that the amount of the Monthly Commission Bonus shall be calculated by Medmetry, that right does not free Medmetry of its implied contractual obligations to make the calculations in good faith and in accordance with the Agreement's requirements and to perform those such obligations to the best of its ability.

84.     Finally, Section 14 of the Agreement provides, in relevant part, "[i]n

the event of termination, any accrued but unpaid Monthly Commission Bonus that would otherwise have been payable to you shall be paid on the next date on which a Monthly Commission Bonus amount would have otherwise been payable to you, prorated through the date your employment terminates."

85.     As discussed below, the P&Ls provided are missing a lot of required numbers.

86.     The numbers provided indicate that certain categories of claimed revenue and expenses are presumptively fraudulent.[2] Specifically, the revenue appears to be fraudulently reduced, and the expenses appear to be fraudulently increased.

87.     That had the net effect of artificially reducing the commissions due to Flanagan.

88.     Defendants provided presumptively fraudulent data to Flanagan, expecting him to rely on it and accept less commissions than he was due.

89.     Starting in early to mid-2022, Flanagan began requesting the following:

(i)     The <u>components</u> of Medmetry's calculation of each month's

Monthly Commission Bonus, dating back to April 1, 2020, as this was when

---

[2] While Plaintiff has not included a Fraud claim due to the heightened pleading standard outlined in Fla. R. Civ. P. 1.120(b), Plaintiff reserves the right to add this claim if additional evidence of fraud is discovered in this matter.

the commission bonus was backdated to include; and

(ii)    The <u>records underlying</u> Medmetry's calculation of each month's Monthly Commission Bonus, dating back to April 1, 2020.

90.    Flanagan requested the "components" and "records underlying" Medmetry's calculation of each month's Monthly Commission Bonus dating back to April 1, 2020, the beginning date of the Agreement.

91.    As reflected in the Agreement, the "components" of Medmetry's calculation of each month's Monthly Commission Bonus are the amounts of each line item that make up the "Monthly Applicable Healthcare Staffing Net Profits" (*i.e.*, the gross revenues received by the Company during a calendar month on account of its healthcare staffing services, reduced by four (4) different potential categories of expenses).

92.    As reflected in the Agreement, the "records underlying" Medmetry's calculation of each month's Monthly Commission Bonus are those records that prove the numbers asserted for each component.

93.    To date, Medmetry has only provided Flanagan with incomplete Profit and Loss Statements (P&L) for April 2020 to June 2022.

94.    The P&Ls provided do not show the numbers for many of the "components" of "the Monthly Applicable Healthcare Staffing Net Profits" formula.

95.    For example, the P&Ls do not show the following:

(i)    The gross revenues. (*See* Section 4 of the Agreement, including "Gross Profits" as a component).

(ii)    The amount of salary reduced for Defendant Alvarez or Defendant Kolbehdari. (*See* Section 4 of the Agreement, including a salary expense $5,000 cap on each such individual as a component).

(iii)    Whether the substantial monthly payroll reflected on the P&Ls were only for employees and contractors who provided services in furtherance of Medmetry's healthcare staffing services, as opposed to paying such individuals for work unrelated to those services. (*See* Section 4 of the Agreement, including a compensation expense for employees and contractors as a component, but only to the extent the compensation was in furtherance of healthcare staffing services).

(iv)    Any details for several categories of expenses to ascertain whether the expenses are deducible under Section 162 of the IRS or under lines 7 through 19 of IRS Form 1120-S or the equivalent future sections of the IRC. (*See* Section 4 of the Agreement, including such deductions as the final two components).

96.    Additionally, Medmetry provided **none** of the "records underlying" Medmetry's calculation of each month's Monthly Commission Bonus.

97.    Section 6 of the Agreement explicitly gives Flanagan the right to independently verify the numbers of each component by requesting the "records

underlying" each component.

98.    The "records underlying" Medmetry's calculation of each month's Monthly Commission Bonus would necessarily include, *inter alia*:

     (i)    Bank statements;

     (ii)   Payroll for Rick Alvarez;

     (iii)  Payroll for Amin Kolbehdari;

     (iv)  Receipts for invoices paid by clients; and

     (v)   Receipts for invoices paid by Medmetry for expenses included in the "Monthly Applicable Healthcare Staffing Net Profits" formula.

99.    Despite Flanagan's requests, Medmetry has refused to provide the "records underlying" needed to verify the numbers in the P&Ls or verify the numbers and categories missing from the P&Ls.

100.    As a result, Medmetry is in breach of the Agreement.

101.    These documents are necessary for Flanagan to independently verify the specific amounts of commissions due for each month from April 2020 to present.

102.    Flanagan needs the following:

     (i)    The alleged amounts for each component in the "Monthly Applicable Healthcare Staffing Net Profits" formula from April

2020 through July 2022; and

(ii)    The underlying records to support the alleged amounts for each
component for those months.

103.    Finally, Medmetry did not calculate the commissions due to Flanagan
monthly beginning in April 2020, as Section 6 of the Agreement required.

104.    In sum, Medmetry breached several provisions in Section 6 of the
Agreement.

105.    Additionally, Medmetry owes Flanagan commissions for the **entire**
month of July 2022 because he was terminated in bad faith on July 15, 2022.

106.    In or about May 2022, Medmetry requested that Flanagan sign an
agreement titled "At-Will Employment Agreement" (referred to as "Proposed
Agreement") which included a non-compete provision.

107.    The Proposed Agreement had language that effectively sought to claw
back substantial commissions already owed to Flanagan and provide him with a
less lucrative commission plan moving forward.

108.    Flanagan opted not to sign the Proposed Agreement, which included a
non-compete provision.

109.    Instead, Flanagan asked to receive the amounts he had already earned
under the pre-existing Agreement.

110.    Flanagan also continued to insist that Medmetry provide the

17

documents to which he was entitled under Section 6 of the Agreement so that he could verify the past due commissions owed to him.

111.   Flanagan made several complaints in writing on this subject.

112.   Medmetry refused to provide Flanagan with the documents he requested and was entitled to under the Agreement.

113.   On July 15, 2022, Flanagan provided two weeks' notice of resignation, with his last day of employment being July 31, 2022.

114.   In his notice of resignation, Flanagan clarified that he would remain a full-time employee during the final two weeks and was also glad to assist in the transition.

115.   Flanagan's notice of resignation repeated his request for the "records underlying" Medmetry's calculation of each month's Monthly Commission Bonus to verify the specific amount of past due commissions.

116.   Flanagan's commissions for the month of July 2022 were substantial.

117.   Instead of allowing Flanagan to finish working the month of July 2022, Medmetry terminated him immediately on July 15, the day he gave two weeks' notice.

118.   Medmetry terminated Flanagan's employment in retaliation for his complaints of Defendants' unlawful conduct and to avoid paying substantial commissions due for the remainder of July 2022.

119.    To date, Medmetry has not paid Flanagan **any** commissions due under the Agreement.

## COUNT ONE: UNPAID OVERTIME IN VIOLATION OF THE FLSA (ALL DEFENDANTS)

120.    Plaintiff incorporates paragraphs 1-119 by reference.

121.    All Defendants' failure to pay Plaintiff time-and-a-half rate for hours over forty (40) per workweek violates the FLSA. 29 U.S.C. § 207.

122.     None of the exemptions provided by the FLSA regulating the duty of employers to pay overtime at a rate not less than one and one-half times the regular rate at which its employees are compensated apply to Defendants or Plaintiff in this matter.

123.    Defendants failed to keep adequate records of Plaintiff's work hours and pay in violation of section 211(c) of the FLSA.  *See* 29 U.S.C. § 211(c).

124.    Federal law mandates that an employer is required to keep for three (3) years all payroll records and other records containing, among other things, the following information:

   a.  The time of day and day of the week on which the employees' work week begins;

   b.  The regular hourly rate of pay for any workweek in which overtime compensation is due under section 7(a) of the FLSA;

c.  An explanation of the basis of pay by indicating the monetary amount paid on a per hour, per day, per week, or other basis;

d.  The amount and nature of each payment which, pursuant to section 7(e) of the FLSA, is excluded from the "regular rate";

e.  The hours worked each workday and total hours worked each workweek;

f.  The total daily or weekly straight time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation;

g.  The total premium for overtime hours.  This amount excludes the straight-time earnings for overtime hours recorded under this section;

h.  The total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments;

i.  The dates, amounts, and nature of the items which make up the total additions and deductions;

j.  The total wages paid each pay period; and

k.  The date of payment and the pay period covered by the payment.

29 C.F.R. 516.2, 516.5.

125.  Defendants have not complied with federal law and have failed to maintain such records with respect to Plaintiff.

126.   Because Defendants' records are inaccurate and/or inadequate, Plaintiff can meet his burden under the FLSA by proving that he performed work for which he was improperly compensated, and produce sufficient evidence to show the amount and extent of the work "as a matter of a just and reasonable inference." *See, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*¸ 328 U.S. 680, 687 (1946).

127.   As a direct and proximate result of Defendants' deliberate underpayment of wages, Plaintiff has been damaged in the loss of wages for one or more weeks of work with Defendants.

128.   Plaintiff is entitled to recover his unpaid overtime compensation.

129.   Plaintiff is also entitled to an amount equal to all his unpaid wages and fees as liquidated damages. 29 U.S.C. § 216(b).

130.   Plaintiff is entitled to recover his attorney's fees and costs as required by the FLSA. 29 U.S.C. § 216(b).

## COUNT II – BREACH OF CONTRACT FOR UNPAID WAGES (AGAINST MEDMETRY)

131.   Plaintiff incorporates paragraphs 1-119 by reference.

132.   On or about July 31, 2020, Medmetry offered Flanagan the Agreement, attached as Exhibit A.

133.   Flanagan accepted the Agreement, attached as Exhibit A.

134. Flanagan provided adequate consideration for the Agreement, attached as Exhibit A.

135. The Agreement, attached as Exhibit A, is a legally enforceable contract.

136. Medmetry breached the Agreement attached as Exhibit A, as outlined above.

137. Specifically, Medmetry breached, *inter alia,* Sections 4, 6, and 14 of the Agreement attached as Exhibit A.

138. As a direct and legal consequence of Medmetry breaches of the Agreement, Flanagan has suffered damages.

WHEREFORE, Flanagan respectfully requests the Court do the following:

a.    Enter judgment in Flanagan's favor and against Medmetry;

b.    Award the full amount of unpaid commissions and wages, plus pre-judgment and post-judgment interest;

c.    Award Flanagan all consequential damages allowed by law;

d.    Award Flanagan any and all special damages allowed by law; and

e.    Grant any other relief this Court deems just and proper.

## COUNT III – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST MEDMETRY)

139.   Plaintiff incorporates paragraphs 1-119 by reference.

140.   The Agreement, attached as Exhibit A, is a legally enforceable contract.

141.   The Agreement carried an implied covenant of good faith and fair dealing.

142.   Medmetry breached that covenant of good faith and fair dealing, as outlined above.

143.   Specifically, Medmetry violated this duty with regards to, *inter alia,* Sections 4, 6, and 14 of the Agreement attached as Exhibit A, and by retaliating against Flanagan by terminating his employment to avoid complying with the above Sections and in an attempt to avoid a paying a substantial commission owed to Flanagan.

144.   As a direct and legal consequence of Medmetry's breach of the covenant of good faith and fair dealing, Flanagan has suffered damages.

WHEREFORE, Flanagan respectfully requests the Court do the following:

a.   Enter judgment in Flanagan's favor and against Medmetry;

b.   Award the full amount of unpaid commissions and wages, plus pre-judgment and post-judgment interest;

c.   Award Flanagan all consequential damages allowed by law;

d.      Award Flanagan any and all special damages allowed by law; and

e.      Grant any other relief this Court deems just and proper.

**Jury Trial**

145.      Plaintiff requests a jury trial on all issues so triable.

Dated: October 27, 2022

_/s/ Warren D. Astbury_
**WILLIAM J. CANTRELL**
Florida Bar No. 1013254
Email: wcantrell@premierlitigators.com
**WARREN D. ASTBURY**
Florida Bar No.: 78056
Email: wastbury@premierlitigators.com
Secondary: lcaulder@premierlitigators.com
**CANTRELL ASTBURY KRANZ, P.A.**
401 East Jackson Street, Suite 2340
Tampa, Florida 33602
Telephone: (877) 858-6868